Isaac T. Preston, Testamentary Executor of James Brown, deceased, *v.* Francis Ann Humphreys and others, Heirs of John Brown Humphreys, deceased.

A wife has no power to alienate any part of the real or personal estate of the community, or to throw any obstacle in the way of its disposition by the husband, during the existence of the community. But she may dispose of her private estate, and consequently of that portion of the community property, which, after her death and the settlement of the community, may become part of her estate.

Where subsequently to the date of a will by which the wife bequeathed all her interest in certain community property, but before the dissolution of the community by the death of the wife, the husband sells the property to the devisee, there is an end of the devise, which is ambulatory and without effect until the death of the testatrix. Had there been no sale, the devisee might, after the settlement of the community, have claimed the interest under her will. -

The legatees of the husband or wife, have no claim against the community until all its debts are paid.

APPEAL from the District Court of the First District, *Buchanan, J.* The executor of James Brown, deceased, is appellant from a judgment rendered against him, in an action to recover of the heirs of John B. Humphreys, a balance due for the price of one-sixth part of a sugar plantation, sold by Brown to their ancestor. The material facts of the case are stated in the opinion of the court.

*R. H. Chinn,* for the appellant.

*Henry Clay,* on the same side. Brown being the sole owner of a sugar plantation on the German Coast in Louisiana, sold one-third of it to J. B. Humpreys in 1816, and entered into a partnership with him, to conduct it for the term of ten years. That partnership expired in 1826, and between that period, and 1830, Brown sold to Humphreys one-sixth of the plantation, making Humphreys' interest a moiety. The sale was effected by an interchange of letters between the parties, and was reduced to an authentic act before a notary, on the 14th May, 1830. This act stipulated, on the part of Humphreys, for the payment of $18,000, for the sixth part, and the payment was to be made out of Humphreys' proceeds of the plantation; but if not completed by the 1st of January, 1834, it was then to be made by him. It is expressly admitted, that only $9000 of the $18,000, the price of the one-sixth, has been paid. How, then, are the defendants to escape from its payment? They rely upon a provision in the will of Mrs. Brown; and this brings us to the consideration of that document, out of which arises the only question in the case.

The intention of the testator is the fundamental, imperative, and controlling law of wills. It is to be sought for, disregarding all technicalities, all ungrammatical expressions, all imperfections of language. It is to be sought for, too, by a full and candid view of the whole instrument, and not of its broken and detached parts.

Preston, Executor, v. Humphreys and others.

When found, if not contrary to law, it is to be faithfully executed. With these guides, let us endeavor to ascertain what was Mrs. Brown's intention, in the parts of her will which have been relied on.

Humphreys had bought, in 1816, and obtained, a title to one-third. He had purchased, between 1826 and 1830, one-sixth, to complete his half ; but the evidence of the purchase was to be found in letters which had been interchanged between the parties. This, Mrs. Brown probably knew. In July, 1839, she made her will, in that state of the second purchase of Humphreys, and before it had been reduced to writing by the act of 14th of May, 1830. The facts just stated, and the simple reading of the clause of the will, demonstrate the clear object of the testatrix to have. been, simply to secure to Humphreys the legal title to the one-sixth. *That* was the only object. Let us look at extraneous circum-stances, as well as at the testamentary language. Humphreys was no blood relation of Mrs. Brown. He was in easy, if not opulent circumstances. She had a mother, two sisters, the descendants of two others, and of a brother—in all, six persons, or their de-scendants, standing in the nearest of all human relations to her, except those of husband and children,  They, or some of them, were poor.   Her portion of the estate was $26,000, which, divi-ded into six parts, would be. for each a little over $4000.   Is it credible, that she intended to bequeath to J. B. Humphreys $9000, and to her own mother and sisters only about $4000 each ?

But let us return to the will.   She bequeathed to Mr. Brown, all other sums due to him.   This included the debt due by J. B. Humphreys.  This bequest is  perfectly consistent with the sub-sequent devise to Humphreys in respect to title.  A will must be so constructed as to give effect to all and each of its parts.  But it is contended, on the other side, that although the bequest com-prehends the debt of Humphreys, it comprehends it in general terms, and that the subsequent devise to Humphreys is an excep-tion.   The general principle is admitted ; but the exception which is to qualify a general grant or bequest, must be a clear case of exception—not of doubtful and strained interpretation.   It should have clearly devised the debt of Humphreys to him.   But what

is the language of the will? It is a devise, not of a debt, but of a legal title, which Mr. Brown is requested to make. Is it not going too far to say, that a title to real estate and a debt—that a reality and a chose in action, are synonymous and identical? and is not *that* a strained and illegitimate inference, which supposes that the testatrix, in providing for the quieting of a title, intended to give up, or release a large debt? But Mrs. Brown was not competent to release a debt due to her husband. In conclusion, the debt due by Humphreys is a valid one. No prescription bars it—no payment. It has been attempted to discharge it by a syllogism—a strained implication—an inference extorted from repugnant premises.

*T. Slidell,.* for the defendants. It is important to ascertain, at the out-set, by the rules of what jurisdiction this will should be interpreted. This will is not dated at any place\*, nor does it ap-

---

The will of Mrs. Brown is in the following words :—

" I, Nancy Brown, being in sound mind and memory do make the following, as my last and only will and testament.

" I give to my husband James Brown absolutely and unconditionally all the property, to which I may be entitled, *not lying in the State of Louisiana,* and direct that all such sums of money as may be due and owing to my said husband and myself, now in the hands and control of our agents Daniel W. Coxe of Philadelphia, and John Jacob Astor of New York, a debt due to my husband from Thomas H. Benton of Missouri, and a debt due from Mr. Cole Bomford of Washington, for which he, my said husband, holds their notes, may, together with other sums due to him, may be paid to my said husband, on his simple receipt, which shall be sufficient to discharge the same.

" My nephew, John B. Humphreys of Louisiana, having a legal title to one-third part of the estate bought by my husband on German Coast, in La., consisting in land, negroes, sugar establishments, stock and other property found thereon, and he, the said Humphreys, having since purchased of my husband one other sixth part of said estate for which he has not yet received a legal title, I do will and devise to him all my interest in such sixth part, and do authorize and request my husband to make him a deed for the said sixth, so that he may hold the said German Coast estate as partner equal joint proprietor with my husband, to whom I will and devise the interest I have in same, and the negroes and every thing thereon to be held, used, occupied and enjoyed by my husband during his lifetime.—And it is my will that at his death *my legal portion thereof, that is to say, one-fourth* part of the said German Coast estate, should descend to such of my brothers and sisters, or brothers' and

pear by testimony, *dehors* the will, where it was written. But the domicil of the testatrix was in Louisiana.

There is no doubt, that a will of real estate must be interpreted according to the law *rei sitæ*—of the country where the land lies, especially when that country is the domicil of the testator. It is now also well settled, that the interpretation of a will, especially a will written and prepared by the testator himself, must be interpreted with reference to the law of his domicil, if it be a moveable which is the subject of the disputed part of the will.

Story, in his Conflict of Laws, p. 409, says : " In another case, the same principle was adopted, and the court laid down the rule, that in the construction of a will, the *lex domicilii* must govern, unless there is sufficient on its face to show a different intention in the testator. The facts were these. A lady, a native of Scotland, was domiciled in England. On a visit to Edinburgh, she made a will entirely in the Scotch form, and it was deposited with

---

sisters' descendants as by the law of Louisiana, would be entitled to the same, had I died intestate, and that the other fourth of said estate should be passed as my husband may direct.

" It is my will and desire that my husband shall, immediately after my death, enter into possession of all the estate and property we jointly hold, without inventory, expense or intervention of justice, provided the laws will permit this to be done, and the partnership between him and my nephew John B. Humphreys continue, but if it be necessary to appoint executors, then I appoint Henry Clay, and Thomas Smith, the first my brother in law, the latter my nephew, as executors of this my last will and testament.

" I give to my mother during her life annually, the sum of five hundred dollars, to be paid by my husband out of the funds and revenues hereby bequeathed to him.

" I give to my sister Susan Price, five hundred dollars to be paid to her annually during her life, or until the death of my husband, to be paid by him out of the said estate.

" I recommend my relations generally to the kindness of my husband, convinced that he will feel pleasure in giving all the pecuniary assistance which his means will permit.

" The whole of this will, by which I revoke all former wills made by me, is written with my own hand, and signed this third day of July, in the year of our Lord, one thousand eight hundred and twenty-nine.

NANCY BROWN.

the writer at Edinburgh.   She had personalty in England only, and died in England.   Scotland, then, was the *domicilium originis et forum contractus ;* but, on the other hand, England was the *forum domicilii,* and the *locus rei sitœ.*   The question was, whether by the legatee's death, in the lifetime of the testatrix, the legacy lapsed according to the law of England, or survived to the legatee's representatives according to the laws of Scotland.   The court decided, that being domiciled in England, it was to be presumed, that she intended the law of England to be applied ; and that there was not enough in the will to repel that presumption."

To the same effect is the language of the Supreme Court of the United States in the case of *Harrison* v. *Nixon,* 9 Peters, 503.

" The present is the case of a will, and so far at least as the matter of the bill is concerned, is exclusively confined to personalty bequeathed by that will.   And the court are called upon to give a construction to the terms of the will, and in an especial manner, to ascertain who is meant by the words " heir at law," in the leading bequest in the will.   The language of wills is not of universal interpretation, having the same precise import in all countries, and under all circumstances.   They are supposed to speak the sense of the testator, according to the laws or usages of the country where he is domiciled, by a sort of tacit reference ; unless there is something in the language which repels or controls such a conclusion.   In regard to personalty, in an especial manner, the law of the place of the testator's domicil governs in the distribution thereof, and will govern in the interpretation of wills thereof ; unless it is manifest that the testator had the laws of some other country in his own view.

" No one can doubt, if a testator born and domiciled in England during his whole life, should, by his will, give his personal estate to his heir at law, that the *descriptio personœ* would have reference to, and be governed by, the import of the terms in the sense of the laws of England.   The import of them might be very different, if the testator were born and domiciled in France, Louisiana, Pennsylvania or Massachusetts.   In short, a will of personalty speaks according to the laws of the testator's domicil, where there are no other circumstances to control their application ; and to raise the question, what the testator means, we must

first ascertain what was his domicil, and whether he had reference to the laws of that place, or to the laws of any foreign country. Now, the very gist of the present controversy turns upon the point, who were the person or persons intended to be designated by the testator, under the appellation of " heir at law." If, at the time of making his will, and at his death, he was domiciled in England, and had a reference to its laws, the designation might indicate a very different person, or persons, from what might be the case, (we do not say what is the case,) if, at the time of making his will, and of his death, he was domiciled in Pennsylvania. In order to raise the question of the true interpretation and designation, it seems to us indispensable that the country, by whose laws his will is to be interpreted, should be first ascertained : and then the inquiry is naturally presented, what the provisions of those laws are."

We, therefore, feel authorized, in considering the language and investigating the meaning of this will, to invoke the principles of law established by the Code of Louisiana, and recognized in the civil law, which forms its basis.

By the law of community which prevails in Louisiana, Mrs. Brown was the equal partner with her husband, in the subject of the donation (*mortis causa*) to Humphreys. Whether the interest of Mrs. Brown, in the one-sixth of the plantation spoken of in the will, was real estate or the price of real estate, is immaterial as regards the community rights of Mrs. Brown. If death had overtaken her the instant after the signature of her will, what difference would it have made as regards the share appertaining to her succession, whether it was real estate, or the price of real estate ? In either case, one-half of the one-sixth, be it the price or the land, would have belonged to her succession, and would have been subject to her testamentary control.

Now, if at the date of the will, 23d July, 1829, we consider the contract of sale as not complete, and that it was a mere expected contract, yet in embryo, and not having yet assumed such a distinct form as would mutually have imposed on the parties, Brown and Humphreys, the obligations of buyer and seller, then was the one-sixth, at the date of the will, real estate of the community, and, therefore, not comprised in the first clause of the

will, which is a bequest to James Brown of moveables only. There would then be not the shadow of inconsistency, between the donation to Brown and that to Humphreys. For it is clear, that, in the civil law, where debts are bequeathed, unless there be an express or strong inferential inclusion of future debts, those debts only pass which existed at the date of the will. Pothier, in his Treatise on Wills, lays down the following rules :

" Une disposition conçue par termes du présent ou du passé, ne s'étend pas à ce qui survient depuis. Par exemple, si quelqu'un a légué ainsi : je lègue à Pierre ce qu'il me doit, ou ce que *je lui ai prêté*, le legs ne s'étend pas aux nouvelles dettes que Pierre aurait contractées depuis le testament envers le testateur. Œuvres, vol. 10, p. 596, ed. of Paris, by Dupin, of 1827, and vol. 7, p. 409.

Une disposition qui, dans les termes dans lesquels elle est conçue, n'exprime ni temps présent ni passé, ni futur, se rapporte ordinairement au temps du testament.—Par exemple, si j'ai légué à quelqu'un mon argenterie, le legs ne comprend que celle que j'avais lors de mon testament, et non celle que j'aurais acquise depuis. *Cum dicit argentum meum, hac demonstratione, meum, præsens, non futurum tempus ostendit.*"

So, the Civil Code, art. 1713. A disposition couched in terms present and past, does not extend to that which comes afterwards.

For example, a legacy of all the books a testator possesses, does not include those which he has purchased after the date of the testament.

Art. 1715. A disposition, the terms of which express no time, past or future, refers to the time of making the will.

Thus, when the testator expresses simply, that he bequeaths his plate to such a one, the plate that he possesses at the date of his will is only included.

But, on the other hand, if, at the date of the will, the interest was not an immoveable, but was an interest in the price of a binding contract for a sale of the one-sixth, how then does the question stand ?

It is said by the plaintiff, if you treat the interest in the one-sixth belonging to Mrs. Brown, as being, at the date of her will,

not real estate, but the price of real estate, then was it bequeathed to James Brown by the first clause of the testament. We deny it—and we appeal to well established rules of interpretation. We say that a legacy of objects under a generic name or description, does not comprise particular objects, coming under the same generic description, which are specially bequeathed to another legatee.

"Un legs général ne comprend pas les choses comprises sous ce genre, qui ont été léguées en particulier à d'autres personnes."

C'est une suite de cette règle, *in toto jure generi per speciem derogatur, et illud potissimum habetur quod ad speciem directum est.* L. 80, ff. de reg. jur.

Par exemple, si j'ai légué à quelqu'un toutes les provisions de bouche qui se trouveront lors de ma mort, et que j'aie légué à un autre le vin qui se trouvera dans ma cave lors de ma mort ; quoique ce vin soit compris sous ce terme général de provisions de bouche, il ne sera pas néanmoins compris dans le legs général, parce que le testateur en a disposé envers un autre." Pothier. Testaments, vol. 10, p. 593, vol. 7, p. 406.

To the same effect, is the Civil Code, art. 1712. A general legacy does not embrace the things included under the genus, which have been bequeathed, in particular, to other persons.

Moreover, in case of doubt, and of discrepancy, a latter clause in a will overrules an earlier clause in the same will. *In testamentis novissimæ scripturæ valent.* L. 12 and 13, ff. de leg. 1.

" Ce qui est écrit en dernier lieu est présumé contenir la volonté en laquelle le testateur a persévéré, et contenir une dérogation à ce qu'il a écrit auparavant de contraire." Pothier, vol. 10, p. 598, vol. 7, p. 411.

" When a person has ordered two things which are contradictory, that which is last written is presumed to be the will of the testator, in which he has persevered, and a derogation to what has before been written to the contrary." Civil Code, art. 1716.

See also Lord Alvanley's opinion, in 5 Vesey, 247.

If these principles of interpretation be just and reasonable, it is in vain to say, that the devise to Humphreys should yield to the bequest to Brown. The very reverse results from the authorities.

It is, however, ingeniously contended by the plaintiff, that the clause in favor of Humphreys is a mere instruction to Brown by his partner in community, to carry out the contemplated sale of the one-sixth.

In interpreting this clause, we are bound to observe the following well recognized rules of interpretation. We must consider the words in their natural meaning.

"Il ne faut pas néanmoins s'écarter de la signification propre des termes du testament, s'il n'y a pas de justes raisons de croire que le testateur les a entendus dans un autre sens que leur sens naturel." Pothier, vol. 10, p. 587, vol. 7, p. 344.

Our code, art. 1705, says; " In the interpretation of acts of last will, the intention of ₜthe testator must principally be endeavored to be ascertained, without departing, however, from the proper signification of the terms of the testament."

Besides, where words have obtained a precise technical meaning, we ought not to give them a different meaning. It was said by a learned English judge, Lord Kenyon; "It is our duty in construing a will to give effect to the devisor's intention, as far as we can consistently with the rules of law, not conjecturing but expounding his will from the words used. Where certain words have obtained a precise technical meaning, we ought not to give them a different meaning; that would be, as Lord King and other judges have said, removing land marks."

Applying these principles which harmonize and concur in this case, let us inquire what is both the natural meaning, and the technical meaning, of the expressions used by the testatrix. The words are, " *I will and devise to him all my interest in said sixth part.*" Can any thing be more plain than, that these expressions import a donation, To devise, says Johnson, is to grant by will. A devise, says he, is the act of giving or bequeathing by will. Its legal and technical meaning is precisely the same.

Moreover, how is it possible to overlook the fact that, in the very same clause, she uses the very same words. " *I will and devise the interest I have in same,*" when she is giving to her husband the usufruct of the remaining fourth. The truth is, the expressions cannot be distorted from their natural meaning without violence to the context, and an utter disregard of the sense of the

same terms as used elsewhere in the will. The language certainly imports a donation, and nothing but the most pressing and insuperable reasons, fairly deducible from the rest of the instrument, should be permitted to cloud their meaning, and create a doubt of the *beneficent* intention of the testatrix towards Hum phreys.

But it was said in argument by the distinguished counsel of the plaintiff—" the clause is a devise of title—it was intended to operate as a renunciation of the dotal and paraphernal rights of Mrs. Brown, upon the one-sixth of the plantation and slaves." Now it is to be observed, that it has not been shown that Mrs. Brown had either dotal or paraphernal claims ; and in the absence of all evidence, such claims are not to be presumed. But if such was her object, why use the expression "my interest in such sixth part" —the natural expression would have been, "I abandon my claims or my liens upon such part."

If Mrs. Brown is to be considered, on the other hand, as having in view the object, which has been alternatively suggested by the plaintiff, of requesting her husband to go on and complete his contract with Humphreys, we meet with a double difficulty. It is not to be supposed, that a wife would think it necessary to request her husband to carry out honestly and fairly a contract he had made. And, moreover, the husband, being the head of the community and his contracts being binding on it, it would have been a mere piece of supererogation to give her authorization to the sale.

A will, like any other instrument, should never be so construed if it be possible to avoid it by any reasonable interpretation, as to contain a useless and vain order or direction.

"C'est encore une juste raison d'entendre les termes dont le testateur s'est servi dans un autre sens que leur sens naturel, puisque, s'ils étaient pris dans leur sens naturel, ils exprimeraient quelque chose que le testateur n'aurait pu ordonner, ou *aurait inutilement ordonné*." Pothier, vol. 7, p. 400.

"The grand maxim in the construction of wills in law and equity (for the rules are the same in both, and the latter has no greater latitude in this respect than in the former,) is, that the court is bound to find out the intention of the testator, if it be

possible so to do, however inartificially the will may be expressed, and to make such a construction as will effectuate that intention. This is often a difficult task ; for, as Lord Northington remarks, it is the fate of all courts of justice upon wills to be the authorized interpreters of nonsense, and to find the meaning of persons that had no meaning at all. The intention is to be collected, not from any particular or detached clause of the will, but from the whole taken together, and from any codicil which forms a part of it. Every word is to have its effect, provided an effect can be given to it not inconsistent with the general intent of the whole will taken together, for a testator is not to be supposed to have used words without meaning, if it is possible to give them a consistent meaning ; and the rule is not to reject any words, unless there can not be any rational construction of these words as they stand." Ward on Legacy, p. 100.

It has been well said, that the intention of the testator is the polar star that should always guide in the interpretation of a will, and when this intention is distinctly announced in plain and intelligible language in the instrument itself, it would not only be unreasonable, but illegal, to look elsewhere.

It is evident, that Mrs. Brown considered that there was an efficient and binding contract between her husband and Humphreys for the sale of the one-sixth, for she devises to her husband a life estate in the interest she has in the plantation and slaves, which interest she presently afterwards, in the very same clause, defines to be one-fourth part. Thus treating the share of the real estate (properly speaking) existing in herself as but a fourth, and treating the one-sixth as virtually gone from the community, though the legal title still remained. Mrs. Brown, who is to be, like every other testator, supposed to have known the laws of her country, knew that the price of the one-sixth was just as much a part of the community property, as that interest in the land, had it remained unsold, would have been. And indeed, it would seem that the clause had been studiously framed to cover the interest in the one-sixth, in whatever shape, whether of land or price, it should exist at her death.

Much was said in argument of the improbability of Mrs. Brown bequeathing $9000 to Humphreys, and smaller sums to her

mother and sisters. It is submitted, that, in the first place, she owed to her husband's industry, and prudence, so far as we may judge from the record, all that she was disposing of by her will. Now, a sense of propriety and justice would very naturally dictate, that she should leave to a relative of her husband, whose activity and fidelity had largely contributed to her husband's fortune, a portion of that property, which, by a most unreasonable and oppressive fiction, our law considers the result of the common industry of man and wife. And, moreover, any one who reads the will of Mrs. Brown, though it be an olographic will, and of course written throughout with her own hand, must feel, that no woman, but on the contrary, a man, and a professional man too, prepared the draft of it. James Brown himself was no doubt the author of that will; and as he exerted his marital influence in carefully guarding his own interests in that instrument, which was in truth a disposition of one-half of the fruits of his own labors and prudence, it is not at all strange, that John Brown Humphreys, his blood relative, and who had faithfully served him for nearly twenty years, should also have been duly considered.

It is not pretended that Mrs. Brown [or Mr. Brown we should rather say] might not have drawn this will, with more complete perspicuity ; the instrument, however, is sufficiently plain, and is not attended with a greater share of ambiguity than is usually exhibited in last wills. This species of instrument seems more than any other to be prone to ambiguity ; and it would be a hard task for even an old and experienced lawyer to draw a will, at all extended in its provisions, that would not be, in some things, obscure. Sir John Bland, we are told, made his own will, and at the close of it said, that he had disposed of his estate in so clear a manner, that he thought it impossible for any lawyer to doubt about it. This will was afterwards contested, and it came before Lord Hardwicke, who said, that he was at loss to conceive what was the real intention of the testator ; that he wished he could find *some ground on which to form a conjecture.*

The point was raised by one of the counsel, that the devise to Humphreys lapsed by reason of the subsequent conveyance of the one-sixth. We have endeavored to show, that the language of the testatrix was so framed as to cover her interest in the land, or its

price. But were it not so, it will be remembered, that the doctrine that a sale subsequent to the making of the will revokes tacitly the legacy of the thing sold, rests upon the principle of a change of intention in the mind of the testator. Here, no such change of intention is inferable ; for the sale had been long in contemplation, and the very words of the testatrix evince her knowledge of its being in contemplation, and point to its expected consummation.

MARTIN, J. The plaintiff seeks to recover the balance of the price of an undivided sixth part of a sugar estate, sold by his testator to the defendants' ancestor. · They set up a claim under the will of the testator's wife ; and aver, that all demands of the testator on their ancestor, or his estate, have been settled and discharged. They had a verdict and judgment, and the plaintiff appealed. The clause of the will under which they claim is in the following words : "My nephew, John B. Humphreys of Louisiana, having a legal title to one-third part of the estate bought by my husband on German Coast in Louisiana, consisting in land, negroes, sugar establishments, stock, and other property found thereon, and he, the said Humphreys having since purchased of my husband, one other sixth part of said estate, for which he has not yet received a legal title, I do will and devise to him, all my interest in such sixth part, and do authorize and request my husband to make him a deed for the said sixth, so that he may hold the said German Coast estate as partner, equal joint proprietor with my husband." The sixth part of the estate spoken of in the above clause, is the same which was sold by the testator to the defendant's ancestor, and for which the latter promised to pay eighteen thousand dollars, a sum which is admitted to have been reduced by partial payments, during the life of the testator and since, to nine thousand dollars. The will bears date the 3d day of July, 1829 ; the act of sale, the 14th of May, of the succeeding year ; and the testatrix died on the 20th of October, of that year. The power of the wife to alienate any part of the real or personal estate of the community, or to put any obstacle to the disposition of it by her husband, during the existence of the community, can not be contended for. She has, however, that of disposing of her private estate, and consequently of that portion of the community property which, after her death, and the settle-

ment of the community, may become part of her estate. If her husband had not, according to her desire, executed the act of sale before us, the affairs of the community being settled, and one-half of the undivided sixth part of the plantation fallen into her estate, there cannot be any doubt that the defendants could claim it under her devise. But that sixth part having been sold during the existence of the community, and before her death, there was an end to the devise ; for a devise is an alienation, is ambulatory during the life of the testator, and has no effect until the breath goes out of his body. At the death of the testatrix, therefore, she had no longer the power of alienating the land devised.

But it is contended, that the devise was not of the land itself, but of the testatrix's interest therein ; that the defendants' ancestor was the equitable owner of it, or rather had a right of demanding a legal title on paying the price ; that her interest was therefore, in the price, and that it was her share of that price which she bequeathed. This may be undeniable, although the plaintiff's counsel denies it. Admitting that it is, the part of the price bequeathed was a legacy which ought to be applied for to the testatrix's executors. It cannot be retained, and withheld from the plaintiff, because it is a part of the assets of the community, on which neither the legatees of the husband, nor of the wife, can have any claim in opposition to the creditors of the community, *id est*, until all its debts are paid. The defendants, after having complied with the obligations of their ancestor, by paying the price of the property he purchased, may enforce their rights under Mrs. Brown's will against her executors, on what remains of her estate after her creditors have been satisfied, provided such executors receive, on the settlement of the affairs of the community, a sum sufficient to discharge the legacy.

It is, therefore, ordered and decreed, that the judgment be annulled and reversed, and that the plaintiff recover from the defendants, the sum of nine thousand dollars, with interest at the rate of five per cent per annum, from the 1st of January, 1834, the period on which the payment of the price of the estate was to be completed, with costs in both courts.